# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 24-00181-TFM |
| | ) |
| JOSE MIGUEL DE PAZ TOVILLA, | ) |
| Defendant. | ) |

## SENTENCING MEMORANDUM ON BEHALF OF JOSE MIGUEL DE PAZ TOVILLA

NOW COMES the Defendant, Jose Miguel De Paz Tovilla, by and through undersigned counsel, and respectfully submits his Sentencing Memorandum for the Court's consideration regarding his upcoming sentencing. Since Tovilla has filed objections to the PSR, he will address those first.

**I. Introduction**

As of November 1, 2025, the mitigating-role adjustment operates differently as applied to individuals convicted of drug-trafficking offenses who served only a low-level trafficking function. Specifically, the amended § 2D1.1 has a new "special instruction" (at (e)(2)) for applying § 3B1.2 role reductions in drug trafficking cases. Under that instruction, role reductions can now be triggered solely by a person's primary function in the global drug-trafficking market and are not available only to those "substantially less culpable than the average participant" in the same

criminal enterprise, as was previously the case. *Accord* U.S. Sentencing Guidelines Manual § 2D1.1(e)(2)(B) (U.S. Sent'g Comm'n 2025) (providing general availability of § 3B1.2 reductions based on a person occupying a low-level drug trafficking function) [hereinafter USSG] *with id.* § 2D1.1(e)(2) (providing that role reductions are available in single-defendant criminal offenses and regardless of individual's culpability relative to others in the same criminal conduct).

Under § 2D1.1(e)(2), Jose Miguel De Paz Tovilla is entitled to a 4-point role reduction. When combined with the amended mitigating role base offense level caps, his total adjusted offense level is 30.

**II      Objection to Role in the Offense. Under the new, broadly worded special instruction at § 2D1.1(e)(2), a person's   primary function in the global drug trade is sufficient on its own to trigger the § 3B1.2 role reductions.**

This Court's assessment of § 2D1.1(e)(2) begins with the text. Section 2D1.1(e)(2) is expansive on its face: It instructs courts to apply § 3B1.2 based upon a person's place within the generic drug trafficking hierarchy and not, as § 3B1.2 otherwise provides, based solely on comparing the defendant's conduct to others within his specific criminal scheme. The text of § 2D1.1(e)(2) is expansive in at least five ways:

- First, § 2D1.1(e)(2) affirmatively establishes that a role reduction is now generally warranted for individuals whose functions are among the "low" and "lowest" drug trafficking functions and specifies functions meeting those standards. *See* § 2D1.1(e)(2)(B)(i)–(ii). Prior to this amendment, courts had interpreted § 3B1.2 as not permitting a reduction based solely

on function. *See, e.g., United States v. McWaters*, 139 F.4th 727, 729-30 (8th Cir. 2025) ("The fact that [defendant] was a courier . . . , alone, is insufficient to show his entitlement to a reduction."); *United States v. McCombs*, 128 F.4th 911, 915–16 (7th Cir. 2025) ("[D]rug couriers are neither automatically entitled to, nor precluded from, a mitigating role reduction."). Now, function plainly suffices.

- Second, § 2D1.1(e)(2) specifies that its focus is on the person's "primary" function—not necessarily the most-serious function that the person performed. *See* § 2D1.1(e)(2)(B)(i)–(ii).[1]
- Third, § 2D1.1(e)(2) provides examples of generally covered functions but clarifies that those examples are not exhaustive. *See* § 2D1.1(e)(2)(B)(i) (providing for reduction for "lowest level . . . functions, *such as*" listed functions); *see also id.* § (e)(2)(B)(ii) (same as to "low-level" functions).
- Fourth, as mentioned above, § 2D1.1(e)(2) eliminates the requirement that any other individual be involved in the instant criminal conduct and that the court consider an individual's culpability relative to others who are involved in the instant criminal conduct. Prior to this amendment, individuals were regularly denied reductions due to being charged in single-defendant cases. This change reflects a key difference between drug trafficking offenses and most other federal offenses. While an individual may commit, for example, bank robbery or fraud completely on their own (making the

idea of an "aggravated" or "mitigated" role nonsensical), a person who traffics drugs is necessarily participating in a broader, international, half-trillion-dollar illegal drug market. *Cf. Gonzales v. Raich*, 545 U.S. 1 (2005) (holding that even self-grown marijuana could be subject to federal regulation pursuant to Congressional power to regulate interstate commerce). A person who commits a drug trafficking offense is necessarily part of a trafficking network (likely multiple) that involves other individuals, regardless of whether they are charged or whether the Court can identify them.

- Fifth, § 2D1.1(e)(2)'s text is also expansive on its face because of what it lacks: conduct-based limitations that would be present in a restrictive provision. Notably, under § 2D1.1(e)(2) it does not matter how long a person served a particular function, the number of times the person fulfilled that function, whether the person appeared to be "trusted" by higher-level traffickers, the specific type and weight of substance(s) involved in the offense, what conduct the average person in a given jurisdiction commits, or whether the person has been assessed points for violence or weapons. Any of these may be relevant to sentencing in a particular case, *see* 18 U.S.C. § 3553(a), but regardless, they do not impact application of this offense-level reduction in the advisory Guideline calculation.

---

[1] As discussed *infra*, the Commission sought input on whether to use a person's primary function or most serious conduct and opted for the former.

To summarize, USSG § 2D1.1(e)(2)'s new text is expansive, instructing courts to apply the mitigating role reduction in far more drug-trafficking cases than § 3B1.2's generally applicable rules would permit. Given the frequency with which courts sentence individuals who performed low-level functions,[2] § 2D1.1(e)(2) could finally get drug-trafficking guideline ranges closer to the lower sentences that courts nationwide actually impose.

**III      The Sentencing Commission intended § 3B1.2 to be applied liberally in § 2D1.1 cases.**

Section 2D1.1(e)(2)'s promulgation history further underscores that role reductions are intended to now be broadly available in § 2D1.1 sentencings. The U.S. Sentencing Commission promulgates amendments pursuant to the Administrative Procedure Act's "notice and comment" rulemaking requirements. *See* 18 U.S.C. § 994(x) ("The provisions of [the APA] relating to publication in the Federal Register and public hearing procedure, shall apply to the promulgation of guidelines . . . ."). As to USSG § 2D1.1(e)(2), the Commission held a roundtable discussion among judges, academics, and practitioners focusing on drug trafficking sentencings;[3] released proposed amendments to the public with explanations for the

---

[2] *See, e.g.,* U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* 37 (2024) (finding that 48.4% of people sentenced for methamphetamine trafficking offenses in FY2022 acted as street-level dealers, brokers/go-betweens, couriers, renters/storers, employees, or some other low-level function); *see also* U.S. Sent'g Comm'n, *Fentanyl and Fentanyl Analogues: Federal Trends and Trafficking Patterns* 28 (2021) (finding 65.8% of people sentenced in drug cases involving fentanyl and 64.1% of people sentenced in cases involving fentanyl analogues in FY2019 had a role at street dealer or lower, excluding cases where the role could not be determined); U.S. Sent'g Comm'n, Report to Congress: *Mandatory Minimum Penalties for Drug Offenses* 167 (2011) (finding the most common function of their sample of cases from FY2009 was courier at 23.0%).
[3] News Release, U.S. Sent'g Comm'n, *U.S. Sentencing Commission Seeks Comment on New Round of Proposed Amendments* (Jan. 24, 2025),

proposals;[4] solicited public comment on the proposals;[5] held a hearing with stakeholder witnesses;[6] and then promulgated final amendments with further explanations.[7] Throughout this process, the Commission repeatedly indicated its intent to substantially increase the rate at which people sentenced for drug offenses receive § 3B1.2 reductions, including the four-level reduction.

The Commission first proposed what became § 2D1.1(e)(2) in February 2025 as part of a broader package of proposed amendments to the drug-trafficking guideline.[8] Initially, the Commission proposed a function-based reduction as a new "specific offense characteristic" within § 2D1.1, but it would have operated like what would become § 2D1.1(e)(2).[9] The Commission explained that its § 2D1.1 proposals, including the proposed function adjustment, were intended "to address concerns that the Drug Quantity Table . . . overly relies on drug type and quantity as a measure of offense culpability and results in sentences greater than necessary to

---

https://www.ussc.gov/about/news/pressreleases/january-24-2025 (indicating that proposed drug amendments "further respond to [a] roundtable[] the Commission held last year on . . . drug sentencing.").

[4] *See generally* U.S. Sent'g Comm'n, *Sentencing Guidelines for United States Courts*, 90 Fed. Reg. 8968, 8985–92 (proposed Feb. 4, 2025) [hereinafter *Proposed Amendments*].

[5] *See generally* Public Comments on Proposed Amendments for Supervised Release & Drug Offenses (2025), https://www.ussc.gov/sites/default/files/pdf/amendment-process/publiccomment/202503/90FR8968_public-comment_R.pdf [hereinafter *Public Comment on Proposed Amendments*].

[6] *See generally* U.S. Sent'g Comm'n, Transcript of Public Hearing (Mar. 12, 2025), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-andmeetings/2025031213/Transcript-Day1.pdf [hereinafter *Hearing Transcript*].

[7] U.S. Sent'g Guidelines Manual app. C (vol. IV) amend. 833 (U.S. Sent'g Comm'n 2025)(codified in U.S. Sent'g Guidelines Manual § 2D1.1(e)(2) (U.S. Sent'g Comm'n 2025)) [hereinafter *Reason for Amendment*].
[8] *See generally Proposed Amendments.*
[9] *Id.* 90 Fed. Reg. 8991–92.

accomplish the purposes of sentencing."[10] In so stating, the Commission clarified that its proposals were intended to address perhaps the most impactful and oft-criticized error in § 2D1.1.[11] Even more directly, the Commission explained that its proposal was grounded in "commenters hav[ing] raised concerns that the mitigating role adjustment from Chapter 3, Part B . . . is applied inconsistently in drug trafficking cases and does not adequately reflect individuals' roles in drug trafficking offenses."[12]

Of further note, in addition to soliciting comment about whether to create a function-focused reduction, the Commission also specifically asked whether that

---

[10] *Id.* at 8985–96.

[11] 11 *See*, *e.g.*, Daniel J. Freed & Marc Miller, *Editors' Observations*, 2 Fed. Sent. Rep. 189, 190 (Vera Inst. Just. 1990) (complaining about judges' inability to factor individual characteristics into the guideline calculation and, in this context, describing an early case sentenced under the new guidelines in which the judge complained about the lack of distinction between "a drug dealer who preys on society and needs to be imprisoned" and "an addict defendant who is a medical case and a victim of those drug dealers selling miniscule amounts of drugs to support her habit, and thus needs treatment rather than incarceration"); Tr. of Hearing at 77 (Mar. 5, 1991) (testimony of Hon. Mark Wolf on behalf of the Jud'l Conf.'s Comm. on Crim. L. and Prob'n) ("Yes, we believe that the guidelines place excessive reliance on quantity, with inadequate room to consider role in the offense. The result is that low- level drug offenders receive proportionately far more severe punishment than mid- and high - level drug offenders, and the problem is compounded by the reality that the street level guy or the mule or the lookout usually knows little about the larger operation, and, thus, has no one to roll over on, while the kingpin has all kinds of useful information with which to buy a 5K1.l departure."),
https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-andmeetings/19910305/19910305_Transcript.pdf; Ltr. from Hon. Maryanne Trump Barry, Chair of the Jud'l Conf. Crim. L. Comm., to the U.S. Sent'g Comm., at 2 (Mar. 6, 1995) (in the context of advocating for the Sentencing Commission to simplify role adjustments, noting that the Judicial Conference had "repeatedly urged that sentences in drug cases be driven less by drug quantity"),
https://www.ussc.gov/sites/default/files/pdf/amendment-process/publiccomment/199503/199503_PCpt2.pdf (PDF p. 18); Tr. of Public Hearing Before the U.S. Sent'g Comm., New York, New York, at 92–93 (July 9, 2009) (Hon. Newman) ("You are the Sentencing Commission within the judicial branch. What we need from you, even under the era of mandatory minimums, is your best judgment of what the sentence should be for a person who transports a certain amount of heroin or has a certain kingpin role or a certain mule role. We, the country, need[] your judgment [about] what the right sentence should be."),
https://www.ussc.gov/sites/default/files/Public_Hearing_Transcript_0.pdf.

[12] *See Proposed Amendments,* 90 Fed. Reg. at 8986.

reduction should: 1) be foreclosed for individuals whose offenses included violence; 2) be foreclosed for individuals who possessed firearms; and 3) focus on a person's "primary" function or, instead, their "most serious" function.[13] The Commission likewise sought input regarding whether the provision should include an exhaustive list of qualifying functions or mere examples of potentially qualifying functions.[14]

After receiving hundreds of pages of public comment and holding a hearing on the proposals, the Commission promulgated § 2D1.1(e)(2). While this represented a different logistical approach to the function reduction—creating the special instruction for applying § 3B1.2 instead of a new specific offense characteristic—essentially every decision that the Commission made from its proposal represented the broadest possible choice: it did not categorically exclude anyone based on offense characteristics; it based the reduction on the defendant's "primary" (instead of "most serious") function;[15] and it implemented an amalgamation of the checklist versus-examples approaches, offering roles that would generally trigger the reduction but also making clear that the listed examples are not exclusive.[16]

The Commission's written explanations for the final amendment further demonstrate the expansive nature of the amendment. The Commission explained in

---

[13] *See id.* at 8987 (describing various options for which Commission sought comment).
[14] *See id.* ("However, unlike Option 1, Option 2 would not list low-level trafficking functions to which the reduction would necessarily apply. Instead, Option 2 would list functions that may qualify for the reduction as examples.").

[15] *See* USSG § 2D1.1(e)(2)(B)(i)–(ii) (basing qualification on person's "primary function" and making no mention of most serious conduct).

[16] *See id.* (providing that reduction "is generally warranted" if performed a low-level function and prefacing listed examples with "such as"). cases."

its "Reason for Amendment" that it had "previously amended the Commentary to §3B1.2 to increase its usage" but the earlier amendment "did not result in a sustained increase in application of the mitigating role adjustment in §2D1.1.[17] The Commission thus created § 2D1.1(e)(2) to "encourage broader use of § 3B1.2" in drug trafficking cases, by "expand[ing] the circumstances in which an adjustment under §3B1.2 is warranted in §2D1.1 cases."[18]

In both action and explanation, the Commission has made clear that post amendment, the mitigating role reduction works differently—more specifically, much more expansively—in drug-trafficking cases.

**IV     A person is a courier, entitled to a four-level "lowest-level function" reduction, where the person's primary function was transporting contraband.**

Because USSG § 2D1.1(e)(2) does not define "courier," this Court gives that term its ordinary meaning. Dictionary definitions of the term "courier" are in full agreement: a courier is defined simply by the action of traveling and transporting contraband. *See, e.g., Courier*, Oxford English Dictionary (a courier is "a messenger who runs; a person who travels with letters, dispatches, etc . . . ."), https://doi.org/10.1093/OED/1046928279; *id.* ("A person employed to transport contraband goods, esp. drugs."); *Courier*, Merriam Webster (defining courier as "a messenger: such as . . . a runner of contraband."); *see also Drug Courier*, Black's Law Dictionary (12th ed. 2024) ("Somebody who has been employed to transport illegal drugs.").

---

[17] *See Reason for Amendment.*

[18] *Id.*

The Commission has long used the term "courier" consistent with this plain meaning. It has published studies discussing drug-trafficking functions and, whenever it has done so, it has defined couriers simply as people who "transport[] or carr[y] drugs in or on their person or with the assistance of a vehicle or other equipment."[19] Indeed, in the context of this amendment, the Commission provided a data briefing (on its originally proposed amendments) to the public that included a pair of samples of prior sentencings broken down by the roles the sentenced people occupied in those cases.[20] That sampling used the same definition for couriers.[21]

To the extent that the government might suggest [or has suggested] that § 2D1.1(e)(2)(B)(i)'s reference to "courier" is cabined beyond its ordinary meaning—indeed, beyond the Commission's own articulation of its ordinary meaning—plainly, that would be wrong.[22] The new special instruction is silent as to any limitations on the meaning

---

[19] *See, e.g.*, U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* 37 (2024), https://www.ussc.gov/sites/default/files/pdf/research-andpublications/research-publications/2024/202406_Methamphetamine.pdf. At times the Commission instead breaks out this conduct into the separate roles of "courier" and "mule." The definition remains the same but divides the category based on whether the person used a vehicle (courier) or the person's body (mule). *See, e.g.,* U.S. Sent'g Comm'n, *Mandatory Minimum Penalties for Drug Offenses in the Federal Criminal Justice System* 44 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2017/20171025_Drug-Mand-Min.pdf.

[20] *See generally* U.S. Sent'g Comm'n, *Proposed Amendments on Drug Offenses Public Data Briefing* (2025), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/databriefings/2025_Drug-Offenses.pdf.

[21] *Id.* at 12–13.

[22] Courts have previously rejected mitigating role reductions for couriers based upon the extent of their knowledge or the quantity of contraband, but such cases predate § 2D1.1(e)(2)'s new, function-focused special instruction for § 3B1.2 reductions. More to the point, these cases were not about the meaning of "courier"; the idea was not that a person ceased to be a courier once they carried a certain quantity of goods, but just that prior, ordinary rules for applying § 3B1.2 did not apply to largescale couriers. ; *cf. also, e.g., United States v. Morales Torres*, 382 F. Supp. 3d 131 (D. Mass. 2019) (repeatedly referring to individual as courier in case where he was alleged to have transported $220,000 worth of fentanyl); *United States v. Salinas*, 763 F.3d 869, 873–74 (7th Cir. 2014) (referring to individual as "courier" despite individual's

of "courier" based on quantity, value, route, frequency, or otherwise, and this silence is especially notable for several reasons:

- First, the amendment's text expressly references quantity when it *is* pertinent to the analysis. Specifically, § 2D1.1(e)(2)(B)(ii), which addresses the two-level reduction, provides as a qualifying example a person whose "primary function was . . . distributing controlled substances *in user-level quantities* . . . ." The reference to quantity for one function example and silence as to another indicates that quantity is irrelevant where not so mentioned.

- Second, the amendment's history demonstrates that the Commission knowingly chose not to provide quantity or frequency limitations. During the notice-and-comment period, the Department of Justice urged the Commission not to promulgate a function-based reduction because "the proposal ma[de] no distinction based on quantity or frequency [and did] not distinguish between an individual who [serves as a courier] once and another who does so dozens of times, regardless of the quantities involved."[23] At the hearing on the proposed amendments the Commission heard testimony both from DOJ and Defender attorneys practicing on the southern border where courier quantities are often substantial.[24] There, as well, DOJ

---

vehicle having lead-lined secret compartments and being caught with over $300,000 from a 1,000-pound marijuana transaction).
[23] *Public Comment on Proposed Amendments* at 257–58 (letter from DOJ).
[24] *See Hearing Transcript* at 7 (introducing witnesses including Assistant U.S. Attorney from W.D. Texas and Assistant Federal Public Defender from S.D. Texas who previously served in W.D. Texas).

encouraged the Commission not to find that large-weight, international couriers are lowest-level functionaries.[25] The Commission chose not to take the DOJ's advice.

- Third, the silence regarding quantity and frequency is notable because § 3B1.2 itself used to expressly reference those factors in determining whether a courier received a reduction—before the Commission eliminated those factors. Specifically, prior to 2001, commentary regarding the four-level minimal role reduction both encouraged courts to use the reduction "infrequently" and provided examples of who should receive the reduction.[26] One example was that of a person who participated "in a single marihuana shipment" or as "a courier for a single smuggling transaction involving a small amount of drugs." In 2001, the Commission removed that example (and the language calling for "infrequently" granting reductions).[27] Having once included language distinguishing among couriers based on quantity and frequency, it is noteworthy for the Commission to provide new, courier-focused language with no limitations or distinctions whatsoever.[28]

---

[25] *See, e.g., id.* at 14 (DOJ witness contending that high quantities are not entrusted to low-level individuals).

[26] *See, e.g.*, U.S. Sent'g Guidelines Manual § 3B1.2 App. N. 2 (U.S. Sent'g Comm'n 2000) ("It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.").

[27] *See* U.S. Sent'g Guidelines Manual app. C (vol. II) 224–28 (U.S. Sent'g Comm'n 2025) (removing the example via Amendment 635); *see also id.* app. C (vol. III) 406 (striking prior language calling for minimal role to "be used infrequently" via Amendment 755).

[28] And that prior language itself demonstrated that, absent modification, the term "courier" does not carry any quantity or frequency limitations. Had it done so, the examples would not have had to specify that the courier at issue should have been infrequently involved.

- Fourth, just last year—that is, just before promulgating the relevant amendment—the Commission reported that having a large quantity of substances is *entirely consistent with* being a courier. In its 2024 methamphetamine report, the Commission explained that couriers in meth cases transported an average of 21 kilograms—"double the quantity . . . compared to high level suppliers . . . ."[29] And even earlier, in a 2011 report to Congress, the Commission noted that "the quantity of drugs involved in an offense is not closely related to the offender's function in the offense."[30]
- Fifth, reading into the instruction a weight-based limitation would make little sense in light of the base offense level caps that are triggered by a person receiving a § 3B1.2 reduction. Drug trafficking base offense levels are tied exclusively to drug type and quantity. Under the same amendment, if a person such as Tovilla who would otherwise have a base offense level between 32 and 38 receives the four-level § 3B1.2 reduction for serving a courier function, that person's base offense level is reduced to 30. If high drug quantities meant that a person could not fit the definition of a courier, there would be no need for a base offense level cap applicable to the highest offense levels for people who receive the mitigating role adjustment.

The Commission's decision not to tie application of § 2D1.1(e)(2) to drug quantity or trip frequency makes sense. At bottom, the drug trafficking industry can be analogized to any number of profit-driven, product-selling, international companies like

---

[29] U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* 39 (2024).

[30] U.S. Sent'g Comm'n, *2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 168 (2011).

Amazon or Walmart. As in the drug trafficking industry, those companies serve as retail and distribution networks for products that are themselves produced and transported by the (often-internationally based) manufacturer's networks. A person whose job is delivering Amazon packages (or carrying Walmart inventory) is a courier—whether on their first hour of work or their twentieth year; whether their vehicle[31] contains millions of dollars in goods or carries a single package; and whether the person is in a probationary period, seasonal, or a long-tenured employee. And if that courier quits their job—or, to make for a closer analogy—is arrested and thereby forced to leave their job, the impact on Amazon's functioning and its bottom line will be negligible regardless of any of those factors. In the context of federal sentencing, arresting a courier has little impact on the drug-trafficking market (as with an Amazon delivery-driver, he will be quickly replaced), which is relevant to multiple purposes of sentencing. *See* § 3553(a)(2) (enumerating as purposes of sentencing protection of the public and deterrence).

V.   SECTION 3553 FACTORS

The Court should exercise its discretion to impose a reasonable sentence on Jose Miguel De Paz Tovilla. This case presents multiple reasons for departure and/or variance below the guideline range, to a sentence of 60 months or less. Such a sentence is fully consistent with §3553 which requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the four purposes of federal sentencing which are the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford

---

[31] Tovilla submits that a boat is a type of vehicle because it is a watercraft used as a means of transportation.

adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In order to impose a sentence, Section 3553 requires a sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).

1. **The history and characteristics of Jose Miguel De Paz Tovilla**.

It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams* v. *New York,* 337 U.S. 241, 247(1949); see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

The Court should exercise a wide discretion in the sources and types of evidence used to assist it in determining the kind and extent of punishment to be imposed within limits fixed by law," *Williams*, at 246, particularly "the fullest information possible concerning the defendant's life and characteristics," *id.*, at 247. That principle is codified at 18 U.S.C. §3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and at *§ 3553(a)*, which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics," *§ 3553(a)(1)*.

The Presentence Investigation Report outlines some of the background of Jose Tovilla. He is a hard-working family man who has never participated in this type of conduct. He's worked for years in the maintenance department of a shipping company in Mexico. He was uninformed of any details of the boat trip and took no part in the planning and/or organizing of the transportation of the contraband and served only as a low level "deckhand" to aid as needed. Anyone that has ever experienced a commercial boat charter, whether for fishing, work, or pleasure, is aware that there are differing levels of importance, starting with the most important being the captain with the lowest being a deckhand.

To provide greater clarity about Jose Tovilla, his family and friends have sent letters and pictures that offer the Court a better understanding of who Jose Tovilla is and his life leading to the present day. More information will be provided at the sentencing hearing, but the following is offered Pursuant to 3553(a).

2. **Letters of Support**

Rule 32(i)(4) of the Federal Rules of Criminal Procedure permits a defendant

the opportunity to present any information to mitigate the sentence. The third party submissions are provided for the Court's consideration in determining an appropriate sentence to comply with the statutory directives of 18 U.S.C §3553(a). The letters range from family, friends and employers. The letters describe a man known for his kindness who was motivated to help others, and who performed good works that benefited many in the community in which he lives. They also describe a person who has been humbled by his mistakes and has accepted his fate. These letters, written by those that know Jose the best, express a belief that he is worthy of this Court's mercy and that he will successfully comply with requirements and/or terms of supervised release imposed by the court.



Jose with family at daughters' graduation.

**3. Safety Valve Provision. USSG §2D1.1(b)(18).**

The PSR provides for relief in paragraph 16 pursuant to U.S.S.G. §2D1.1(b)(18), and the United States agrees that Tovilla has met the criteria for said relief. Most importantly, this provision allows the Court to impose a sentence without the limitations of a minimum mandatory requirement, so the Court may impose a sentence well under the guidelines if appropriate. Defendant suggests that a sentence in the range of 60 months is reasonable for a first-time courier.


Jose with wife and daughters.

4. **Aberrant Behavior**

The policy statement defined aberrant behavior as a single criminal occurrence that was committed without significant planning, had limited duration, and represented a marked

deviation from the defendant's otherwise law-abiding life. It was formerly found at 5K2.20, and the purpose was to argue for a downward departure in sentencing. Tovilla certainly meets these criteria; however, this departure provision was deleted in the November 1, 2025 amendments in light of the broadly worded special instruction at § 2D1.1(e)(2) regarding a person's primary function in the global drug trade sufficient to trigger the § 3B1.2 role reductions.

IV.    **CONCLUSION AND REQUEST FOR SPECIFIC SENTENCE**

Based on the foregoing reasons and any other that may be considered by the Court, the sentence which should be imposed in this case on Jose Tovilla is one of 60 months with credit for time served with no SRT or other special conditions as Tovilla will be deported upon service of his sentence. He's been detained for the conduct alleged in Count 1 since his arrest. Defendant suggests that such a sentence will fully and adequately satisfy the statutory objectives set forth in § 3553(a).

Respectfully Submitted,

 /s/ *Gordon Armstrong*
Gordon G. Armstrong, III
Attorney for Jose Miguel De Paz Tovilla
P.O. Box 1464
Mobile, AL  36633
(251) 434-6428
(251) 434-6413
gga3@arserv.com

## CERTIFICATE OF SERVICE

  I hereby certify that on November 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record, including the following: George F. May, Attorney for the United States of America, 63 South Royal Street, Suite 600, Mobile, Alabama 36602.

       /s/ *Gordon Armstrong*
      Gordon G. Armstrong, III